1
2
3
4
5
6                  IN THE UNITED STATES DISTRICT COURT
7                       FOR THE DISTRICT OF ARIZONA
8
9   Shannon Michael Clark,              )   No. CV 06-2724-PHX-EHC (HCE)
                                        )
10              Petitioner,             )   **REPORT & RECOMMENDATION**
                                        )
11  vs.                                 )
                                        )
12                                      )
    Dora Schriro; et. al.,              )
13                                      )
                Respondents.            )
14                                      )
                                        )
15  _____    )
16

17          Pending before the Court is Petitioner's *pro se* Amended Petition for Writ of Habeas

18  Corpus filed pursuant to 28 U.S.C. §2254 (hereinafter "Amended Petition") (Doc. No. 18).

19  Pursuant to the Rules of Practice of this Court, this matter was referred to the undersigned

20  Magistrate Judge for preparation of a Report and Recommendation.  For the following

21  reasons the Magistrate Judge recommends that the District Court deny and dismiss the

22  Amended Petition.

23  **I.      FACTUAL & PROCEDURAL BACKGROUND**

24          A.      Petitioner's Conviction and Post-Conviction Proceedings

25          On November 22, 2002, a grand jury sitting in Maricopa County indicted Petitioner

26  on the following two counts: (1) Burglary in the Second Degree (Count 1); and (2)

27  Trafficking in Stolen Property in the Second Degree (Count 2), both of which are class 3

28  felonies.   (Respondents' Answer to Petition for Writ of Habeas Corpus (hereinafter

"Answer") (Doc. No. 7), p. 2 & Exh. A). The State also alleged that Petitioner had four historical prior felony convictions.  (Answer, p. 2 & Exh. B).

At trial, the court dismissed the trafficking count on the State's motion.  (Answer, p.2 n. 1 & Exh. G at pp.5-8).  The jury found Petitioner guilty of second-degree burglary as charged.  (Answer, p.4 & Exh. G at pp. 52-54).  The trial court sentenced Petitioner to the presumptive term of 11.25 years of imprisonment for the Class 3 felony with two historical prior felony convictions.  (Answer, p.4 & Exh. I at pp. 1-2).

Petitioner, through counsel, appealed his conviction and sentence on the ground that the trial court abused its discretion and violated Petitioner's constitutional right to compulsory process to obtain favorable testimony. (Answer, Exh. K, L). The Arizona Court of Appeals affirmed Petitioner's conviction and the Arizona Supreme Court summarily denied review.  (Answer, Exh. M, N, O).

Petitioner next filed a notice of post-conviction relief under Rule 32 of the Arizona Rules of Criminal Procedure.  (Answer, Exh. P.).  Petitioner's counsel on post-conviction relief avowed that she was "unable to find any claims for relief to raise in post-conviction relief proceedings" and requested an extension of time so that Petitioner could file a *pro se* Petition for Post-Conviction Relief.  (Answer, Exh. Q).  The trial court granted the requested continuance and appointed advisory counsel. (Answer, Ex. R, T) Thereafter, Petitioner's advisory counsel filed a  Petition for Post-Conviction Relief (hereinafter "PCR Petition"). (Answer, Exh. DD).  Therein, Petitioner argued that his trial counsel rendered ineffective assistance  for failing to argue that the State had failed to produce evidence that Petitioner was a trafficker in stolen property and for failing to point out inconsistencies between  a witness' pre-trial statements and that witness' testimony. (*Id.*).

The  trial  court  found  that  Petitioner  had  "failed  to  raise  a  colorable  claim  of ineffective assistance of counsel" and summarily dismissed his PCR Petition. (Answer, Exh. GG at p.2).  Thereafter, the Arizona Court of Appeals summarily denied Petitioner's Petition

1  for Review of the trial court's dismissal of his PCR Petition.[1]  (Answer, p. 6, Exh. JJ)

2  Petitioner did not seek review by the Arizona Supreme Court.  (Answer, p.6; Amended

3  Petition, p.2)

4          B.    Petitioner's Federal Petition for Writ of Habeas Corpus

5       On November 2, 2006, Petitioner, acting *pro se*, initiated the instant action. (Doc. No.

6  1). *See Houston v. Lack,* 487 U.S. 266, 270-271 (1988); *Patterson v. Stewart,* 251 F.3d 1243,

7  1245 n.2 (9th Cir. 2001) ("Under the prison 'mailbox rule'...a *pro se* petitioner's petition is

8  deemed constructively filed at the moment it is delivered to prison officials to be forwarded

9  to the court clerk.").   Respondents filed their Answer on February 2, 2007.  (Doc. No. 7).

10  Thereafter, Petitioner was granted leave to file an Amended Petition.  (Doc. No. 17 (Order

11  granting leave); Doc. No. 18 (Amended Petition)).  Respondents filed a "Supplemental

12  Answer" (Doc. No. 19) (hereinafter "Supplemental Answer") and a Second Supplemental

13  Answer (Doc. No. 20) (hereinafter "Second Supplemental Answer").[2]  Petitioner filed

14  Replies to Respondents' Answers.  (TR. 16, 21).

15       Petitioner raises the following three claims for relief in his Amended Petition:

16       1.    Petitioner's conviction violated his Sixth Amendment right to compulsory

17              process and his Fourteenth Amendment right to a meaningful opportunity to

18              present a complete defense (Ground One);

19       2.    Trial counsel was ineffective for failing to impeach Witness Steven Joey with

20              prior inconsistent statements (Ground Two); and

21       3.    Petitioner was denied the right to a fundamentally fair trial under the

22              Fourteenth Amendment due to the cumulative effects of the errors alleged in

23

24       [1]Respondents correctly point out that the trial court's November 29, 2005 order

25  dismissing Petitioner's claim of ineffective assistance of counsel is the "last reasoned

26  decision" of the state court upon which this Court analyzes Petitioner's federal habeas claim
of ineffective assistance of counsel.  (Answer, p.7 n.4) (citations omitted).

27       [2]Respondents' Second Supplemental Answer was filed in response to the Court's

28  order directing further supplementation.  (*See* Doc. No. 17).

1    Grounds One and Two (Ground Three).

2         Respondents concede that Grounds One and Two have been exhausted.  (*See* Answer;

3    Supplemental Answer (Doc. Nos. 7, 19))  However, they argue that Grounds One and Two

4    lack merit.  (*Id.*).  With regard to Ground Three, Respondents argue that such claim is

5    procedurally defaulted and, alternatively, lacks merit.  (Second Supplemental Answer (Doc.

6    No. 20)).

7    **II.    DISCUSSION**

8         Respondents have addressed Grounds One and Two on the merits.

9         A.    Standard of Review: Merits

10        Pursuant to the provisions of the Antiterrorism and Effective Death Penalty Act of

11   1996 (hereinafter "AEDPA"), the Court may grant a writ of habeas corpus only if the state

12   court proceeding:

13             (1)    resulted in a decision that was contrary to, or involved an
                      unreasonable application of, clearly established Federal
14                    law, as determined by the Supreme Court of the United
                      States; or
15
               (2)    resulted in a decision that was based on an unreasonable
16                    determination of the facts in light of the evidence
                      presented in the State court proceeding.
17

18   28 U.S.C. § 2254(d)(1),(2).  Section 2254(d)(1) applies to challenges to purely legal

19   questions resolved by the state court and section 2254(d)(2) applies to purely factual

20   questions resolved by the state court. *Lambert v. Blodgett,* 393 F.3d 943, 978 (9th Cir. 2004),

21   *cert. denied* 546 U.S. 963 (2005).  Therefore, the question whether a state court erred in

22   applying the law is a different question from whether it erred in determining the facts. *Rice*

23   *v. Collins,* 546  U.S. 333, 342 (2006).  In conducting its review, the federal habeas court

24   "look[s] to the last reasoned state-court decision."  *Van Lynn v. Farmon,* 347 F.3d 735, 738

25   (9th Cir. 2003).

26        Section 2254(d)(1) consists of two alternative tests, i.e., the "contrary to" test and the

27   "unreasonable application" test.  *See Cordova v. Baca,* 346 F.3d 924, 929 (9th Cir. 2003).

28   Under the first test, the state court's "decision is contrary to clearly established federal law

if it fails to apply the correct controlling authority, or if it applies the controlling authority to a case involving facts materially indistinguishable from those in a controlling case, but nonetheless reaches a different result." *Clark v. Murphy,* 331 F.3d 1062, 1067 (9th Cir. 2003) (*citing Williams v. Taylor,* 529 U.S. 362, 413-414 (2000)).   Additionally, a state court's decision is "'contrary to' Supreme Court case law if the state court 'applies a rule that contradicts the governing law set forth in' Supreme Court cases."[3]   *Van Lynn,* 347 F.3d at 738 (*quoting Early v. Packer,* 537 U.S. 3, 8 (2002)).   "Whether a state court's interpretation of federal law is *contrary* to Supreme Court authority...is a question of federal law as to which [the federal courts]...owe no deference to the state courts." *Cordova,* 346 F.3d at 929 (emphasis in original) (distinguishing deference owed under the "contrary to" test of section (d)(1) with that owed under the "unreasonable application" test).

Under the second test, "'[a] state court's decision involves an unreasonable application of federal law if the state court identifies the correct governing legal principle...but unreasonably applies that principle to the facts of the prisoner's case.'" *Van Lynn*, 347 F.3d at 738 (*quoting Clark,* 331 F.3d at 1067). Under the "'unreasonable application clause...a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly...[r]ather that application must be objectively unreasonable.'" *Clark,* 331 F.3d at 1068 (*quoting Lockyer v. Andrade,* 538 U.S. 63 (2003)). When evaluating whether the state court decision amounts to an unreasonable application of federal law, "[f]ederal courts owe substantial deference to state court interpretations of federal law...." *Cordova,* 346 F.3d at 929.

---

[3]"[T]he *only* definitive source of clearly established federal law under AEDPA is the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. *Williams,* 529 U.S. at 412...While circuit law may be 'persuasive authority' for purposes of determining whether a state court decision is an unreasonable application of Supreme Court law, *Duhaime v. Ducharme,* 200 F.3d 597, 600-01 (9th Cir.1999), only the Supreme Court's holdings are binding on the state courts and only those holdings need be reasonably applied." *Clark,* 331 F.3d at 1069 (emphasis in original).

Under section 2254(d)(2), which involves purely factual questions resolved by the state court, "the question on review is whether an appellate panel, applying the normal standards of appellate review, could reasonably conclude that the finding is supported by the record." *Lambert,* 393 F.3d at 978; *see also Taylor v. Maddox,* 366 F.3d 992, 999 (9th Cir.), *cert. denied* 534 U.S. 1038 (2004) ("a federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable.") Section (d)(2) "applies most readily to situations where petitioner challenges the state court's findings based entirely on the state record. Such a challenge may be based on the claim that the finding is unsupported by sufficient evidence,...that the process employed by the state court is defective,...or that no finding was made by the state court at all." *Taylor,* 366 F.3d at 999 (citations omitted). When examining the record under section 2254(d)(2), the federal court "must be particularly deferential to our state court colleagues... [M]ere doubt as to the adequacy of the state court's findings of fact is insufficient; 'we must be satisfied that *any* appellate court to whom the defect [in the state court's fact-finding process] is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate.'" *Lambert,* 393 F.3d at 972 (*quoting Taylor,* 366 F.3d at 1000) (emphasis and bracketed text in original). Once the federal court is satisfied that the state court's fact-finding process was reasonable, or where the petitioner does not challenge such findings, "the state court's findings are dressed in a presumption of correctness, which then helps steel them against any challenge based on extrinsic evidence, i.e., evidence presented for the first time in federal court."[4] *Taylor,* 366

---

[4]Under section 2254(e) "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). The "AEDPA spells out what this presumption means: State-court fact-finding may be overturned based on new evidence presented for the first time in federal court only if such new evidence amounts to clear and convincing proof that the state-court finding is in error....Significantly, the presumption of correctness and the clear-and-convincing standard of proof only come into play once the state-court's fact-findings survive any intrinsic challenge; they do not apply to a challenge that is governed by the deference implicit in the 'unreasonable determination' standard of section 2254(d)(2)." *Taylor,* 366 F.3d at 1000.

1    F.3d at 1000.  *See also* 28 U.S.C. section 2254(e).

2         Both section 2254(d)(1) and (d)(2) may apply where the petitioner raises issues of

3    mixed questions of law and fact.  Such questions "receive similarly mixed review; the state

4    court's ultimate conclusion is reviewed under [section] 2254(d)(1), but its underlying factual

5    findings supporting that conclusion are clothed with all of the deferential protection

6    ordinarily afforded factual findings under [sections] 2254(d)(2) and (e)(1)."  *Lambert,* 393

7    F.3d at 978.

8                   1.       Introduction:  Pertinent State Record for Grounds One and Two

9         Petitioner was discharged on September 1, 2002 from the Arizona Department of

10   Corrections after completing a seven-year prison sentence. (Amended Petition, p. 5-a). Upon

11   his release, he resided at 4730 N. 19th Avenue, Apt. 117, Phoenix, Arizona with his mother.

12   (*Id.*) In October 2002,  Petitioner moved in with one Robert Kane at 5110 N. 19th Avenue,

13   Apt. 308, Phoenix, Arizona. (*Id.*) The incident date giving rise to the charges against

14   Petitioner occurred on November 7, 2002. (Answer, Exh. A). Petitioner was arrested six days

15   later on November 13, 2002 at 4730 N. 19th Avenue, Apt. 237, Phoenix, Arizona. (Amended

16   Petition, p. 5-f).

17        Petitioner was indicted on November 22, 2002 by a Maricopa County Grand Jury for

18   burglary committed on November 7, 2002 at the apartment of Petitioner's neighbor, Ms.

19   Kathy Higgins (hereinafter "Victim"),  located at  5110 N. 19th Avenue,  Apt. 310, Phoenix,

20   Arizona (Count 1); and for recklessly trafficking in property stolen from the Victim (Count

21   2). (Answer, Exh. A). Property taken by Petitioner from the Victim were a television and/or

22   computer and/or stereo. (*Id.*)

23        While residing at 5110 N. 19th Avenue, Apt. 308, Petitioner *Shannon* Clark had

24   introduced himself to the Victim as "*Shane*" (Answer, Exh. E at p.79) or was known as

25   "*Sean*" to another neighbor, Mr. Steven Joey (hereinafter "the Witness" or "Witness

26   Joey")(*Id.* at p.99), who observed Petitioner on November 7, 2002 in the Victim's patio

27   backyard with items later found and determined to have been stolen (*Id.* at pp.102-103).

28   Petitioner's list of defenses at trial did not include the defense of mistaken identity. (Answer,

Exh. EE at p. 9); *see also* Ariz.R.Crim.P. 15.2(b). Nonetheless, Petitioner's basis for his claim to having been misidentified as the person who committed the burglary of the Victim's residence and later  trafficking in the Victim's stolen property is: (1) that one "Sean" Last Name Unknown (hereinafter "LNU") was seen frequenting the Witness' apartment (Amended Petition at p. 5-a); and (2) the Witness' description of "Sean" was one of a person with shoulder-length curly blond hair. (Answer, Exh. E at  p.115).

At Petitioner's trial on March 3, 2003, the Witness testified that Petitioner looked different from when he had observed Petitioner on November 7, 2002: he now had  short and darker hair. (*Id.* at p.119). What is  unequivocal is that the Witness: (1)  knew Petitioner *Shannon* Clark sitting before him at trial as the Defendant, as the same *Sean* whom he knew lived next door to him with Mr. Kane (*Id.* at p. 97-98); (2) he saw Petitioner most every day (*Id.* at p.99); and (3) had no doubt that Petitioner was one and the same.  (*Id.* at p. 105). What is also unequivocal is that the Victim: (1) knew  *Shane*  resided with Mr. Kane in Apt. 308 (*Id.* at p.79); (2) that the *Shane* she knew to have resided with Mr. Kane was one and the same Petitioner *Shannon* Clark sitting before her at trial as the Defendant. (*Id.* at p.79-80); and (3) she, too, had no doubt about this. (*Id.* at p. 95).

The Victim had moved into 5110 N. 19th Avenue, Apt. 310 in September of 2002. (*Id.* at p. 75). Up to November 7, 2002, the incident date, Petitioner, aka *Shane,* had been in the Victim's apartment several times to visit or simply to watch television. (*Id.* at pp. 80-81). On November 7, 2002 the Victim and her two daughters left for work and school respectively at approximately 7:00 a.m. to 8:00 a.m.  (*Id.* at pp. 78-79). Between 10:00 a.m. and 11:00 a.m. on November 7, 2002, the Witness, whose Apt. 309 overlooked the patio backyard of the Victim, awoke and  upon opening his door, saw Petitioner aka *Sean* in the Victim's patio backyard coming over the her fence[5] carrying a small TV or computer. (*Id.* at pp, 96, 102-104, 106).

---

[5]The patio backyard has also been described as having a wall around it. (Answer, Exh. E at pp. 113, 106).

1    The Witness went outside to get a soda which took about two minutes. (*Id.* at p. 105).

2    Upon returning to his apartment, the Witness saw Mr. Kane and Petitioner, aka *Sean*,

3    standing in front of their own Apt. 308. (*Id.* at p.106). The Witness left for work at

4    approximately 12:30 p.m. on November 7, 2002 and returned from work at 4:00 a.m on

5    November 8, 2002 at which time he spoke to the manager about what  he had seen. (*Id.* at

6    pp.112-113, 121). The Witness later spoke to police officers at approximately 6:00 a.m. and

7    7:00 a.m. on November 8, 2002.

8    On November 7, 2002 the Victim came home from work at approximately 3:00 p.m.

9    to 4:00 p.m. and after discovering that her apartment had been burglarized and items had

10   been taken, called the police. (*Id.* at pp. 82-84). Police Officer Christopher Parese of the

11   Phoenix Police Department responded at approximately 6:24 p.m. to the Victim's apartment

12   and spoke to her about the burglary and theft at her apartment. (*Id.* at pp. 131,133-140).

13   Police Officer Charles Baber of the Phoenix Police Department responded to the 5110

14   N. 19th Avenue apartments the next day and spoke to the apartment manager, Mr. Jerry

15   Patton. (*Id.* at p. 150).  Officer Baber determined that on November 7, 2002  *Sean* had come

16   to Mr. Patton's office twice that afternoon and made two phone calls[6] and a short time later

17   a female called asking to speak with *Sean.* (Answer, Exh. DD (Doc. No. 7-6, p. 66)). The

18   female phone caller's phone number was obtained from the apartment manager's caller ID.

19   (*Id.*)

20   Based on information obtained from Mr. Patton, Officer Baber returned the next day

21   and spoke to the Witness. (Answer, Exh. E at p. 151). Based on the information obtained

22   from the Witness, Officer Baber went to Apt 308 and spoke to Mr. Kane. (*Id.* at p. 153).

23   Petitioner was not there at that time. (*Id.)* Found inside Apt. 308 that Petitioner shared with

24

25   ───────────────

26   [6]Petitioner did not testify at his trial nor did he call any witnesses. Petitioner does
concede having made a phone call on November 7, 2002. However, he claims that the phone

27   call was to a friend "Marie LNU" whom he asked to come over to pick him up. She arrived
fifteen minutes later and Petitioner went with her to her apartment "a block or so away."

28   (Amended Petition, p.5-c).

1    Mr. Kane were some of the stolen items from the Victim that she later identified as her own.

2    (*Id.* at p. 154). Mr. Kane stated to Officer Baber that he had not removed anything from the

3    Victim's apartment but it was *Sean* who brought the stolen items to their apartment. (Answer,

4    Exh. DD (Doc. No.7-6. pp. 66)). Mr. Kane also stated that *Sean* called a female named "TK"

5    who later came to their apartment and picked up stolen items. (*Id.*). Mr. Kane was asked to

6    call "TK", later determined to be Ms. Joy Dennis, and have her come over to his and

7    Petitioner's apartment. (Answer, Exh. E at pp. 157-158). Items belonging to and taken from

8    the Victim's apartment were later retrieved from Ms. Dennis' apartment with her consent.

9    (*Id.* at 158).

10                    2.    Ground One: Compulsory Process Denial

11        Petitioner argues that he was convicted in violation of the Sixth Amendment right to

12   compulsory process and his Fourteenth Amendment right to a meaningful opportunity to

13   present a complete defense.  Petitioner's claim involves Ms. Dennis.

14        The State by Maricopa County Attorney Ms. Jacki Ireland, extended to Ms. Dennis

15   use immunity for her testimony at Petitioner's trial on the charges of burglary and trafficking

16   in stolen property. (Answer, Exh. D). It was specifically agreed between Ms. Dennis and the

17   State that Ms. Dennis would be truthful in her testimony regarding  possession of narcotic

18   drugs, the transfer/sale of narcotic drugs, or trafficking in stolen property on November 7,

19   2002. (*Id.*).

20        The trial court was clear in instructing the jury that what the attorneys said in opening

21   statements was not evidence. (Answer, Ex. E at p. 63). However, the State in opening

22   statement outlined the testimony Ms. Dennis would give.    (*Id.* at pp.72-73). It was

23   anticipated that Ms. Dennis would testify that on November 7, 2002, Petitioner, whom she

24   knew, called her to ask if she wanted to buy some property. (*Id.* at p. 72) She inquired of

25   Petitioner what he had and he explained. (*Id.*) Petitioner asked Ms. Dennis if she could get

26   crack cocaine in exchange for the property.(*Id.* at pp.72-73). Ms. Dennis obtained crack

27   cocaine, drove to Petitioner's apartment, met with Petitioner and his roommate Mr. Kane and

28   exchanged the crack cocaine for a TV, stereo, and computer. (*Id.* at p. 73). Ms. Dennis,

1   believing that the property was "legitimate", took such items back to her apartment and set

2   the items up. (*Id.*). Police met with and arrested Ms. Dennis. (*Id.* at p.158). Drugs were

3   recovered from her purse. (*Id.*). She gave them consent to search her apartment and retrieve

4   the items obtained from Petitioner and Mr. Kane and such were ultimately determined to be

5   items taken from the Victim. (*Id.* at p. 73).

6       At Petitioner's trial, the court addressed Ms. Dennis regarding her obligations

7   pursuant to the use immunity agreement she had entered into with the State. (*Id.* at pp. 122-

8   125). Ms. Dennis was represented by counsel, Ms. Pat Shaler. The trial court then

9   adjourned. (*Id.* at p. 125). The trial court convened ten minutes later. (*Id.*). The State then

10   informed the trial court that it believed that Ms. Dennis was not going to testify truthfully[7]

11   and that the State would not be calling her as a witness. (*Id.* at pp.125-126). Petitioner's trial

12   counsel asked the trial court to keep the use immunity agreement in effect anticipating that

13   Ms. Dennis would describe the individual, with whom she had traded crack cocaine for

14   stolen items on November 7, 2002, as having dirty blond hair (*Id.* at p. 126) and, this Court

15   presumes, argue Petitioner's different trial appearance.

16       The trial court ordered that the use immunity agreement was no longer in effect given

17   that the State had requested it and then decided not to call Ms. Dennis as a witness. (*Id.* at

18   p. 127). Moreover, Petitioner was not precluded from calling Ms. Dennis as a witness

19      —————————————

20       [7]Although not clear from the record before this Court, common sense dictates that Ms. Dennis would not identify Petitioner at trial as the individual whom she traded drugs for stolen property on November 7, 2002. It would not have served the State's burden of proof to call her as a witness.

21

22       This Court can only surmise that Ms. Dennis' reconsidered testimony *vis a vis* the State's opening statements and "prior information from [Ms. Dennis]..., and in speaking with the police and/or witnesses in [the] case" (Answer, Exh. E at p. 125), seriously undermined the State's ability to prove Petitioner's reckless trafficking in the Victim's stolen property (Count 2). The State, no longer having the benefit of Ms. Dennis' testimony as a percipient witness to Petitioner *Shannon* aka *Shane* aka *Sean* Clark's trafficking in stolen property, moved to dismiss Count 2 of the indictment. (Answer, Exh. G at pp. 5-8). Ms. Dennis was not a percipient witness to Petitioner *Shannon* aka *Shane* aka *Sean* Clark's commission of burglary of the Victim's residence on November 7, 2002.

28

provided that she not selectively invoke her 5th Amendment right against self-incrimination as to certain questions. (*Id.* at pp. 127, 129). Ms. Dennis' counsel, Ms. Shaler, informed the trial court that if Ms. Dennis did testify, Ms. Dennis would be advised not to answer questions that could criminally implicate her for offenses of drug possession and/or trafficking in stolen property on November 7, 2002.[8] (*Id.* at pp. 127-129). Ultimately, Ms. Dennis was not called as a witness. (Answer, Exh. M at p.4).

On direct appeal, the appellate court affirmed the trial court's ruling regarding Ms. Dennis' testimony as follows:

> "The Sixth Amendment does not confer the right to present testimony free from the legitimate demands of the adversarial system; one cannot invoke the Sixth Amendment as a justification for presenting what might have been a half-truth." *United States v. Nobles,* 422 U.S. 225, 241 (1975). "While the government's interest in cross-examining defense witnesses is not rooted in the Constitution, one of the legitimate demands of the adversary system is the right of cross-examination." *United States v. Gary,* 74 F.3d 304, 309 (1st Cir. 1996) (citation omitted). "Courts have not permitted defendants to call witnesses to the stand who have indicated that they will refuse to answer the government's questions on cross-examination with respect to non-collateral matters." *Id.*; see e.g., *United States v. De La Cruz,* 996 F.2d 1307, 1312-14 (1st Cir. 1993); *Denham v. Deeds,* 954 F.2d 1501, 1503-05 (9th Cir. 1992); *United States v. Esparsen,* 930 F.2d 1461, 1469-70 (10th Cir. 1991); *United States v. Doddington,* 822 F.2d 818, 821-22 (8th Cir. 1987); *United States v. Frank,* 520 F.2d 1287, 1291-92 (2d Cir. 1975).
> Where the witness' claim of privilege shields material testimony from cross-examination, the balance weighs against the defendant. *Gary,* 74 F.3d at 310. In this case, after inquiring into the proposed questioning, the trial court properly determined that the issue was material and appropriate for cross-examination. Given the trial court's "extensive knowledge of

---

[8]Specifically, the trial court stated:

> ...I find that Miss Dennis would not be giving complete testimony, and therefore, it would be improper to have her testify to some things but not others, to show what the full transaction was.
>
> Therefore, Miss Dennis will not be used as a witness with use immunity. She can testify as long as she does not take the 5th Amendment to certain questions, but Miss Shaler already informed us that she would.

(Answer, Exh. E at p.129).

1
2
3

> the case" and its determination "that the Fifth Amendment
> would be properly invoked in response to...relevant questions[,]"
> we find no abuse of discretion [*State v.*] *McDaniel*, 136 Ariz.
> [188] at 194, 665 P.2d. [70] at 76 [(1983)], and affirm Clark's
> conviction and sentence.

4   (*Id.* at pp. 9-10).

5   <u>a.   Ethical Considerations</u>

6   The gravamen of Petitioner's Claim is that his right to compulsory process under the

7   6th Amendment was denied because the State would not bind itself to an agreement with a

8   witness unwilling to abide by the agreement's terms.

9   The use immunity statute states in pertinent part:

10
11
12
13
14
15
16

> In any criminal proceeding before a court..., if a person refuses
> to answer a question or produce evidence of any other kind on
> the ground that he may be incriminated thereby and if the
> *prosecuting attorney*, in writing, requests the court to order that
> person to answer the question or produce the evidence, the court
> may so order and that person shall comply with the order....After
> complying, such testimony or evidence, or any information
> directly or indirectly derived from such testimony or evidence,
> *shall not be used against the person* in any proceeding or
> *prosecution for a crime or offense concerning which he gave*
> *answer* or produced evidence under court order. *However, he*
> *may nevertheless be prosecuted...for any perjury, [or] false*
> *swearing....*

17   A.R.S. § 13-4064 (2003) (emphasis added). The State's use immunity agreement with Ms.

18   Dennis stated in pertinent part that she:

19
20
21

> *shall at all times tell the truth* and nothing other than the truth on
> the witness stand when she is called to testify. It is further
> understood that Joy Ann Dennis shall be subjected to
> prosecution for perjury or false swearing should she knowingly
> provide false testimony or information.

22   (Answer, Exh. D)(emphasis in original). The State was under the distinct impression that Ms.

23   Dennis could identify Petitioner as the individual trafficking in the Victim's stolen property

24   and, by extension, as the same individual who burglarized the Victim's residence wherein

25   he obtained the Victim's property. Thus, use immunity was extended to Ms. Dennis. During

26   a ten minute recess the State determined that if Ms. Dennis testified she would not identify

27   Petitioner as the person whom she traded drugs for stolen property on November 7, 2002.

28   Consequently, the State withdrew its proffer of use immunity. Petitioner moved the trial court

1   to order the State bound, nevertheless, to the use immunity agreement.

2       Mere invocation of the right to compulsory process by Petitioner does not trump the

3   State's ethical obligations. A prosecuting attorney is held to a higher standard of conduct

4   than an ordinary attorney. *State v. Noriega,* 690 P.2d 775, 142 Ariz. 474 (1984), *overruled*

5   *on other grounds, State v. Burge,* 804 P.2d 754, 167 Ariz. 25 (1990). A prosecutor's duty is

6   to seek justice and not merely to convict. *State v. Fisher,* 686 P.2d 750, 141 Ariz. 227 (1984).

7   In fulfilling a higher standard of conduct and duty to seek justice, the Maricopa County

8   Attorney herein,  like any attorney be she civil or criminal, is bound by the Arizona Rules

9   of Professional Conduct.

10      An attorney shall not knowingly make a false statement of fact to a tribunal or fail to

11  correct such. 17A A.R.S. Supreme Court Rules, Rule 42, Rules of Professional Conduct, ER

12  3.3(a)(1) (2003). Prior to adjourning for a brief recess the trial court addressed Ms. Dennis

13  regarding the use immunity agreement and established that: (1) she reviewed it with her

14  attorney; (2) her questions were answered by her attorney; (3) she read the agreement; (4)

15  she signed  it; and (5) she understood her obligation to tell the truth or be subject to perjury

16  charges. (Answer, Exh. E at pp.122-124). An attorney shall not knowingly offer evidence

17  that the lawyer knows to be false and shall take reasonable remedial measures, including, if

18  necessary, disclosure to the tribunal. ER 3.3(a)(4) (2003). After a ten minute recess, the State

19  informed the trial court that Ms. Dennis would not be called as a witness because it was the

20  State's belief that Ms. Dennis would testify falsely. (*Id.* at p. 125). "[T]he court, as well as

21  the prosecutor, has a vital interest in protecting the trial process from the pollution of

22  perjured testimony." *Taylor v. Illinois*, 484 U.S. 400, 417 (1988).

23      An attorney shall not falsify evidence, counsel or assist a witness to testify falsely. ER

24  3.4(b) (2003). Petitioner proposes that the State should have nonetheless called Ms. Dennis

25  to the stand to testify falsely as the State believed she would. The State would have been: (1)

26  forced to impeach its own witness, *see* Ariz. R.Evid. 607; (2) by cross-examining Ms. Dennis

27  before the jury as an unwilling, hostile, or biased witness, *see* Ariz.R.Evid. Rule 611(C); (3)

28  with  use of her pretrial prior inconsistent statements, *see* Ariz.R.Evid. 613(a),  801(d)(1)(A)

1   and/or (C). By so testifying Ms. Dennis would have subjected herself to prosecution for

2   perjury as well as criminal charges she had previously admitted. The State's withdrawal of

3   use immunity was for Ms. Dennis' own protection and in conformity with the highest

4   standards of conduct expected of prosecutors.

5          A prosecutor in a criminal case shall refrain from prosecuting a charge that the

6   prosecutor knows is not supported by probable cause and shall make timely disclosure to the

7   defense of all evidence or information known to the prosecutor that tends to negate the guilt

8   of the accused or mitigates the offense. ER 3.8(a),(d) (2003). The State herein believed Ms.

9   Dennis would testify falsely if called to the stand and so apprised Petitioner when the trial

10  court convened after a ten minute recess. (*Id.* at p.125). At this point in the proceedings it is

11  questionable probable cause existed. Furthermore, the State lacked substantial evidence to

12  warrant a conviction for trafficking in stolen property and would not overcome a motion for

13  judgment of acquittal. *See* Ariz.R.Crim.P. 20 The Petitioner/Defendant is not the architect

14  of the State's case. The State, consistent with the high standard of conduct expected of

15  prosecutors seeking justice rather than a conviction, properly dismissed Count 2 of the

16  indictment charging the Petitioner with trafficking in stolen property.

17                          b.      Fifth Amendment Considerations

18         A.R.S. 13-4064 is quite clear that use immunity extended is between *only* a prosecutor

19  and a prospective witness. Moreover, upon request by the prosecutor in writing, the trial

20  court *may* order the prospective witness to answer questions or produce evidence and the

21  witness shall so comply. The trial court herein questioned Ms. Dennis and queried her trial

22  counsel regarding which questions would and would not be answered were she to testify. (*Id.*

23  at pp. 127-129). The trial court correctly ruled that Ms. Dennis' selective invocation of her

24  5th Amendment right against self-incrimination would not lend itself to ascertainment of the

25  truth and a just determination of the proceedings. (*Id.*); *see also* Ariz.R.Evid. 102.

26         It is well-established that the 6th Amendment does not "provide[] a defendant with a

27  right to demand use immunity for defense witnesses who invoke their privilege against self-

28  incrimination." *United States v. Brutzman*, 731 F.2d 1449, 1451-52 (9th Cir. 1984), *overruled*

1   *on other grounds recognized by United States v. Booth,* 309 F.3d 566, 575 (9th Cir. 2002).

2   Petitioner "does not have an unfettered right to offer testimony that is ..., privileged,...."

3   *Taylor,* 484 U.S. at 410. Petitioner does not provide any evidence that the State coerced or

4   prompted Ms. Dennis to invoke her 5th Amendment privilege. "Nor is an accused entitled

5   to compel a prosecutor to grant immunity to a potential defense witness to get [her] to

6   testify." *United States v. Paris,* 827 F.2d 395, 399 (9th Cir. 1987). The trial court properly

7   exercised its statutory discretion and denied Petitioner's request that the use immunity

8   agreement be enforced. (*Id.*).

9          The Sixth Amendment provides in pertinent part:

10                 In all criminal prosecutions, the accused shall enjoy the right ...
                   to have compulsory process for obtaining witnesses in his
11                 favor....[9]

12   *U.S. Const. Amend VI.* Petitioner, through trial counsel, was aware one week before trial of

13   Ms. Dennis' intent to testify differently from her previous statement to the prosecution.[10] (*Id.*

14   at p. 126). The trial court did not bar Ms. Dennis' testimony provided she not invoke her 5th

15   Amendment right against self-incrimination selectively. (*Id.* at p.129).

16   _____

17          [9]This right is applicable in state as well as federal prosecutions. *Washington v. Texas,*
     388 U.S. 14, 17-19 (1967).

18

19          [10]The record is clear to this Court that trial counsel: (1) interviewed Ms. Dennis one
     week before trial and was aware of her intent to testify contrary to a previous statement made
20   to police; (2) was present and heard the State prosecutor in opening statement commit and
     outline what the State understood would be Ms. Dennis' testimony consistent with a previous
21   statement made to police; (3) was present and heard the trial court explain to Ms. Dennis the
     use immunity agreement requiring her to testify, it is safe to say, favorably for the State and
22   consistent with a previous statement made to police; and (4) after a ten-minute recess
     wherein the State prosecutor determined Ms. Dennis' intent to change her testimony and
23   withdrew the use immunity agreement, trial counsel moved the trial court to order the State
     bound to the use immunity agreement. "[T]he inference that [trial counsel] was deliberately
24   seeking a tactical advantage is inescapable.  Regardless of whether prejudice to the
     prosecution could have been avoided in this particular case, it is plain that the case fits into
25   the category of wilful misconduct in which the severest sanction is appropriate. After all, the
     court, as well as the prosecutor, has a vital interest in protecting the trial process from the
26   pollution of perjured testimony." *Taylor,* 484 U.S. at 417. The trial court went on and ruled
27   correctly in disallowing Ms. Dennis from testifying to selective information.

28

[T]he Compulsory Process Clause...is dependent entirely on the defendant's initiative. Most other Sixth Amendment rights arise automatically on the initiation of the adversary process and no action by the defendant is necessary to make them active in his or her case. While those rights shield the defendant from potential prosecutorial abuses, the right to compel the presence and present the testimony of witnesses provides the defendant with a sword that may be employed to rebut the prosecution's case. The decision whether to employ it in a particular case rests solely with the defendant. The very nature of the right requires that its effective use be preceded by deliberate planning and affirmative conduct.

*Taylor* 484 U.S. at 410 (footnote omitted). Petitioner could have subpoenaed Ms. Dennis to appear at his trial in anticipation that she would testify favorably for him. Petitioner would still be confronted with the dilemma of Ms. Dennis' selective invocation of her 5th Amendment right against self-incrimination  and the trial court would  preclude her testimony for the same reason: The jury should hear Ms. Dennis' full testimony rather than a truncated portion favorable to Petitioner. *United States v. Nobles,* 422 U.S. 225, 241 (1975). Ms. Dennis' testimony regarding a complete accounting of what transpired on November 7, 2002 was not collateral but necessary to prove whether Petitioner trafficked in stolen property or not.

On the instant record, the state court's ruling was not contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court.  Nor did the state court's proceeding result in a decision that was based on an unreasonable determination of the evidence presented.

### 3.      Ground Two:  Ineffective Assistance of Counsel

Petitioner argues herein that trial counsel was ineffective for failing to impeach Witness Joey "with his prior inconsistent statements and false statements." (Amended Petition, p.6-a). According to Petitioner, the Witness' "ability and opportunity to observe what he claimed to have observed was hindered in his prior statements [sic], so he changed them in his trial testimony." (*Id.* at p.6-b).  Petitioner also contends that the Witness' statements implicated the Witness' brother in the burglary of the Victim's apartment.  (*Id.*).

In rejecting such claim raised in Petitioner's PCR Petition, the state court, applying

1   *Strickland v. Washington,* 466 U.S. 668 (1984) held:

2

3          As to the claim that counsel failed to impeach the state's witness, Steven Joey, with a statement he made to the police that was not consistent with his trial testimony, that also was a reasonable tactical decision in that both statements implicated Defendant. Counsel chose to focus on misidentification as a defense rather than pointing the finger at the person Joey said was with Defendant during the burglary. Counsel also attempted to focus guilt on the witness' brother rather than Defendant.

4

5

6

7          As the State points out in its Response, even if there were a determination of ineffectiveness on the above issues, the Court finds nothing that was done by counsel as to her argument or the lack of impeachment prejudiced Defendant since that result would have been the same, based on all the circumstances and facts presented. Steven Joey's identification of the Defendant was very credible.

8

9

10 (Answer, Exh. GG at p.2).

11

12      The Sixth Amendment right to counsel exists "in order to protect the fundamental

right to a fair trial." *Strickland,* 466 U.S. at 684; *Nix v. Whiteside,* 475 U.S. 157, 175 (1986)

13 (The "benchmark" of the right to counsel is the "fairness of the adversary proceeding....");

14 *United States v. Morrison,* 449 U.S. 361, 364 (1981). Thus:

15

16          the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated.

17

18 *United States v. Cronic,* 466 U.S. 648, 658 (1984).

19

20      In *Strickland,* the United States Supreme Court formulated the test for determining

whether counsel rendered constitutionally ineffective assistance. *Strickland,* 466 U.S. at 668.

21 To prevail on any ineffective assistance of counsel claim, the petitioner must show two

22 components: (1) counsel's representation fell below the range of competence demanded of

23 counsel in criminal cases; and (2) the petitioner suffered actual prejudice as a result of

24 counsel's incompetence. *Id.* at 690-693.

25      To establish deficient performance, Petitioner must show that counsel made errors

26 so serious "that counsel's representation fell below an objective standard of reasonableness"

27 under prevailing professional norms. *Strickland,* 466 U.S. at 687-688. The relevant inquiry

28

is not what defense counsel could have done, but rather, whether the decisions made by defense counsel were reasonable. *Babbit v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998). In considering this component, counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland*, 466 U.S. at 690. "The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986); *see also Ortiz v. Stewart*, 149 F.3d 923, 932 (9th Cir. 1998) (quoting *Hensley v. Crist*, 67 F.3d 181, 184 (9th Cir. 1995) ("'[r]eview of counsel's performance is highly deferential and there is a strong presumption that counsel's conduct fell within the wide range of reasonable representation.'"). Additionally, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.

To establish prejudice, the petitioner must show that there is a reasonable probability that the outcome of the trial would have been different but for trial counsel's deficient performance. *Id*. at 691-695. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id*. at 694. However, "an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993). Moreover, the rule of contemporary assessment of counsel's conduct is not implicated in the prejudice component under *Strickland*. Rather, the focus is on "the question whether counsel's deficient performance renders the result of the trial unreliable *or* the proceeding fundamentally unfair." *Id*. at 372 (emphasis added) (citing *Strickland*, 466 U.S. at 687; *Kimmelman*. 477 U.S. at 393)).

Failure to make the required showing of either deficient performance or prejudice defeats the claim. *Strickland*, 466 U.S. at 697-700. The court need not address both factors where one is lacking. *Id*.

1    Matters of strategy and tactics by counsel are given deference and will not support

2    claims of ineffective assistance of counsel. *Strickland*, 466 U.S. at 689; *Mancuso v. Olivarez*,

3    292 F.3d 939, 954-955 (9th Cir. 2002); *State v. Beaty*, 762 P.2d 519, 537 (Ariz. 1988).

4    Counsel has a duty to assist a defendant. *Cuyler v. Sullivan*, 446 U.S. 335, 346 (1980). As

5    a defendant's assistant, counsel has a duty to advocate for the defendant in general and in

6    particular "to consult with the defendant on important decisions and to keep the defendant

7    informed of important developments in the course of the prosecution. Counsel also has a duty

8    to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing

9    process." *Strickland*, 466 U.S. at 688.

10    Defendant at trial is presumed to be innocent of the charges. Defendant has no

11    obligation to testify at trial nor to present evidence. Petitioner did not testify nor present

12    evidence at his trial. Petitioner's defense at trial  was that an individual with long, curly blond

13    hair burglarized the Victim's apartment and that he was misidentified as that individual. The

14    crux of his misidentification was that at trial he had short dark hair. The Witness testified that

15    on November 7, 2002 Petitioner had long blond hair. Though the Victim and the Witness

16    knew Petitioner by slight variations of his true name, both were firm that Petitioner at trial

17    was one and same individual known to them on November 7, 2002. The Victim and the

18    Witness testified that Petitioner lived at Apt. 308 with Mr. Kane. The Witness testified that

19    on November 7, 2002 Petitioner was seen in the Victim's patio backyard with a screened

20    item, either a TV or a computer. The Witness testified that a few minutes later he saw

21    Petitioner and Mr. Kane standing in front of Apt 308, Petitioner's and Mr. Kane's residence.

22    Officer Baber testified that some of the Victim's stolen items were found at Apt. 308,

23    Petitioner's apartment. The line of logic and link of proof is not convoluted.

24    The record amply supports Petitioner's trial counsel's efforts to establish

25    misidentification of Petitioner despite the paucity of evidence available to sustain such. Trial

26    counsel did not ask the Victim questions regarding Petitioner's appearance on November 7,

27    2002 and this was tactically reasonable given that she was not present when the burglary of

28    her apartment occurred. Trial counsel did elicit from the Victim that she did not see

1    Petitioner go into her apartment and take her property. (Answer, Exh. E at p. 94).

2         That the Witness in a prior statement  stated that Petitioner was seen through blinds

3    *vis a vis* his  trial testimony that he saw Petitioner when he went to the door of his apartment

4    is a distinction without merit. The two are neither inconsistent nor mutually exclusive and

5    trial counsel was reasonable in not addressing the two. Not knowing how the Witness might

6    reconcile the two, there was a plausible possibility that the Witness saw Petitioner through

7    the blinds *and* from his door, bolstering  the strength of the Witness' identification of

8    Petitioner, had trial counsel asked.  As it was, the Witness was unequivocal that, having seen

9    Petitioner "mostly every day" (*Id.* at 99), he knew Petitioner, observed Petitioner, recognized

10   Petitioner, and identified Petitioner at trial as the same individual committing a burglary on

11   November 7, 2002.

12        Trial counsel when cross-examining the Witness alluded to the Witness' brother as

13   perhaps being involved in the burglary and inferentially that the Witness was trying to protect

14   his brother.  (*Id.* at pp.108-109).  The Witness was simply unaware and did not know (*Id.*)

15   and trial counsel was bound to the Witness' responses. Trial counsel also unsuccessfully

16   sought responses based upon objectionable hearsay regarding the Witness' brother.[11] (*Id.*)

17   _____

18   [11]This line of cross-examination included:

19        Q.[trial counsel]:       How did you learn that your brother was
                                    connected to this case, your brother
20                                  Anthony?

21        A.[the Witness]:         How was he connected?
          Q:                       Did you learn that he was connected?
22        A:                       I don't know.
          Q.                       All right.  Did you talk to anyone among
23                                  the police officers about your brother
                                    Anthony buying a tape from Robert
24                                  [Kane]?
25        [the prosecutor]:        *Objection; hearsay.*
          [the court]:             You can answer yes or no, whether you
26                                  did talk to the police officers? [sic]
27        ***
          Q. [trial counsel]:      You haven't talked to the police about
28                                  your brother?

1   Moreover, had trial counsel continued efforts to focus guilt on the Witness' brother because

2   the brother had purchased stolen video tapes, such effort would have only served to focus

3   guilt more acutely on Petitioner as the source, and his apartment as the location, of stolen

4   items. Trial counsel ceased this line of questioning while she was ahead.

5           Trial counsel representation did not fall below an objective standard of

6   reasonableness. The tactical decisions regarding questions asked as well as not asked of the

7   percipient Witness to the burglary, were reasonable in light of the lack and quality of

8   evidence then available to support Petitioner's defense of misidentification, which was little

9   or none. Great deference is given to trial counsel's efforts to make a silk purse from a sow's

10  ear. Petitioner having failed to show deficient performance, the Court need not address

11  prejudice.  Consequently, the state court's ruling was not contrary to, or an unreasonable

12  application of, clearly established federal law as determined by the United States Supreme

13  Court.  Nor did the state court's proceeding result in a decision that was based on an

14  unreasonable determination of the evidence presented.

15          B.      Standard: Exhaustion and Procedural Default

16          Respondents argue that Ground Three is procedurally defaulted and, alternatively,

17  lacks merit.

18          A federal court may not grant a petition for writ of habeas corpus unless the petitioner

19  has exhausted the state court remedies available to him.  28 U.S.C. § 2254(b); *Baldwin v.*

20  *Reese,* 541 U.S. 27(2004); *Castille v. Peoples,* 489 U.S. 346 (1989).  The exhaustion inquiry

21  focuses on the availability of state court remedies at the time the petition for writ of habeas

22  corpus is filed in federal court.  *See O'Sullivan v. Boerckel,* 526 U.S. 838 (1999).  Exhaustion

23  generally requires that a prisoner provide the state courts an opportunity to act on his claims

24

25
                        A. [the Witness]:      No.
26                      Q.                     Did you ever see your brother with the
                                               tape?
27                      A.                     No.

28  (Answer, Exh. E at pp.108-109) (emphasis added).

before he presents those claims to a federal court.  *Id.*  A petitioner has not exhausted a claim for relief so long as the petitioner has a right under state law to raise the claim by available procedure.  *See* Id.; 28 U.S.C. § 2254(c).

A habeas petitioner may exhaust his claims in one of two ways.  First, a claim is exhausted when no remedy remains available to the petitioner in state court.  *See* 28 U.S.C. § 2254(b)(1)(A).  Second, a claim is exhausted if there is an absence of available state corrective process or circumstances exist that render such process ineffective to protect the rights of the petitioner.  *See* 28 U.S.C. § 2254(b)(1)(B).

To meet the exhaustion requirement, the petitioner must have "fairly present[ed] his claim in each appropriate state court...thereby alerting that court to the federal nature of the claim."  *Baldwin,* 541 U.S. at 29; *see also Duncan v. Henry,* 513 U.S. 364, 365-66 (1995). A petitioner fairly presents a claim to the state court by  describing the factual or legal bases for that claim and by alerting the state court "to the fact that the...[petitioner is] asserting claims under the United States Constitution."  *Duncan,* 513 U.S. at 365-366.  *See also Tamalini v. Stewart*, 249 F.3d 895, 898 (9th Cir. 2001) (same).  Mere similarity between a claim raised in state court and a claim in a federal habeas petition is insufficient.  *Duncan,* 513 U.S. at 365-366.

Furthermore,  to fairly present a claim, the petitioner "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  *O'Sullivan,* 526  U.S. at 845.  Once a federal claim has been fairly presented to the state courts, the exhaustion requirement is satisfied. *See Picard  v. Connor,* 404 U.S. 270, 275 (1971).  In habeas petitions, other than those concerning life sentences or capital cases, the claims of Arizona state prisoners are exhausted if  they have been fairly presented to  the Arizona Court of Appeals either on appeal of conviction or through a collateral proceeding pursuant to Rule 32 of the Arizona Rules of Criminal Procedure.  *Swoopes v. Sublett,* 196 F.3d 1008, 1010 (9th Cir. 1999), *cert. denied* 529 U.S. 1124 (2200).

In some instances a claim can be technically exhausted even though the state court did

not address the merits.  This situation is referred to as "procedural bar" or "procedural default."  A claim is procedurally defaulted if the state court declined to address the issue on the merits for procedural reasons.  *Franklin v. Johnson,* 290 F.3d 1223, 1230 (9th Cir. 2002).  Procedural default also occurs if the claim was not presented to the state court and it is clear the state would now refuse to address the merits of the claim for procedural reasons.  *Id.*  The procedural bar provides an independent and adequate state-law ground for the conviction and sentence and, thus, prevents federal habeas corpus review unless the petitioner can demonstrate cause and prejudice for failing to raise the claim in the state proceedings.  *Gray v. Netherland,* 518 U.S. 152, 161-162 (1996); *see also Murray v. Carrier,* 477 U.S. 478, 485-495 (1986); *Franklin*, 290 F.3d at 1231.  Accordingly, the procedural default doctrine prevents state prisoners from obtaining federal review by allowing the time to run on available state remedies and then rushing to federal court seeking review.  *Coleman v. Thompson,* 501 U.S. 722, 731-732 (1991).

If a claim has never been presented to the state court, a federal habeas court may determine whether state remedies remain available.[12]  *See Harris v. Reed,* 489 U.S. 255, 263 n.9 (1989); *Franklin,* 290 F.3d at 1231.  In Arizona, such a determination often involves consideration of Rule 32 *et seq.* of the Arizona Rules of Criminal Procedure governing post-conviction relief proceedings.  For example, Ariz.R.Crim.P. 32.1 specifies when a petitioner may seek relief in post-conviction proceedings based on federal constitutional challenges to convictions or sentences.  Under Rule 32.2, relief is barred on any claim which could have been raised in a prior Rule 32 petition for post-conviction relief, with the exception of certain

---

[12]Although the Ninth Circuit has suggested that, under Ariz.R.Crim.P. 32.2, there are exceptions to the rule that a district court can decide whether state remedies remain available for claims that require a knowing, voluntary, and intelligent waiver *see Cassett v. Stewart*, 406 F.3d 614 (9th Cir. 2005), *cert. denied,* 546 U.S. 1172 (2006), this Court need not address such waiver because it has not been affirmatively raised by Petitioner.  *See Beaty v. Stewart,* 303 F.3d 975, 987 & n.5 (9th Cir. 2002), *cert denied,* 538 U.S. 1053 (2003).

1   claims[13] which were justifiably omitted from a prior petition.  Ariz.R.Crim.P. 32.2.

2       In summary, failure to exhaust and procedural default are different concepts.

3   *Franklin*, 290 F.3d at 1230-1231.  Under both doctrines, the federal court may be required

4   to refuse to hear a habeas claim.  *Id.*  The difference between the two is that when a petitioner

5   fails to exhaust, he may still be able to return to state court to present his claims there.  *Id.*

6   In contrast, "[w]hen a petitioner's claims are procedurally barred and a petitioner cannot show

7   cause and prejudice for the default...the district court dismisses the petition because the

8   petitioner has no further recourse in state court."  *Id.* at 1231.

9                  1.    Ground Three:  Cumulative Effect

10      Petitioner claims that he was denied his right to a fundamentally fair trial in light of

11  the cumulative effects of the errors asserted in Grounds One and Two of his Amended

12  Petition.  Respondents contend that Petitioner never presented such claim to the state court

13  and, therefore, the claim is procedurally barred from federal habeas review.

14      Respondents are correct that Petitioner did not present this argument to any level of

15  the state court.  "If [Petitioner]... were to return to state court now, the claim would be found

16  waived and untimely under Rules 32.2(a)(3) and 32.4(a) of the Arizona Rules of Criminal

17  Procedure because it does not fall within an exception to Arizona's rule of preclusion. *See*

18  Ariz.R.Crim.P. 32(b); 32.1(d)-(h). Therefore, [Petitioner's Ground Three]...is 'technically'

19  exhausted but procedurally defaulted because Petitioner no longer has an available state

20  remedy.  *Coleman,* 501 U.S. at 732, 735 n.1."   *Lee v. Schriro,* 2009 WL 32743 at *8

21

22

---

23      [13]Such claims include: (1) that the petitioner is being held in custody after his

24  sentence has expired; (2) certain circumstances where newly discovered material facts
    probably exist and such facts probably would have changed the verdict or sentence; (3) the

25  petitioner's failure to file a timely notice of post-conviction relief was without fault on his
    part; (4) there has been a significant change in the law that would probably overturn

26  petitioner's conviction if applied to his case; and (5) the petitioner demonstrates by clear and
    convincing evidence that the facts underlying the claim would be sufficient to establish that

27  no reasonable fact-finder would have found petitioner guilty beyond a reasonable doubt.

28  Ariz.R.Crim.P. 32.2(b) (citing Ariz.R.Crim.P. 32.1(d)-(h)).

1  (D.Ariz. January 6, 2009)[14] (finding petitioner's claim of cumulative effect of errors
2  procedurally barred).

3       Where "'a state prisoner has defaulted his federal claims in state court pursuant to an
4  independent and adequate state procedural rule [as in the instant case], federal habeas review
5  of the claims is barred unless the prisoner can demonstrate cause for the default and actual
6  prejudice as a result of the alleged violation of federal law, or demonstrate that failure to
7  consider the claims will result in a fundamental miscarriage of justice.'" *Cook v. Schriro,* 538
8  F.3d 1000, 1025 (9th Cir. 2008)(*quoting Coleman,* 501 U.S. at 750).

9       Generally, "cause" sufficient "to excuse a default exists if the petitioner 'can show
10  that some objective factor external to the defense impeded counsel's efforts to comply with
11  the State's procedural rule.'" *Id.* at 1027 (*quoting Murray,* 477 U.S. at 488).

12       Petitioner argues that because "Arizona courts do not recognize the cumulative-error
13  doctrine, which Respondents readily acknowledge...", the state corrective process is
14  inadequate and it would have been futile for him to assert such a claim.  (Petitioner's Reply
15  to Respondents' Second Supplemental Response", pp. 3-4 (*citing* 28 U.S.C. §§
16  2254(b)(1)(B)(i) and (ii)).

17       The Ninth Circuit has recognized an exception to the exhaustion requirement if
18  exhaustion in state court would be futile.  *Sweet v. Cupp,* 640 F.2d 233, 236 (9th Cir. 1981).
19  However, the Supreme Court subsequently "criticized the futility doctrine, ruling that it does
20  not excuse the failure to exhaust a habeas claim in state court proceedings."  *Lee,* 2009 WL
21  32743 at *8 (*citing Engle v. Isaac,* 456 U.S. 107, 130 (1982)).  In rejecting the argument that
22  exhaustion would have been futile in light of then-existing state law, the *Engle* Court stated:

23            We note at the outset that the futility of presenting an objection
              to the state courts cannot alone constitute cause for a failure to
24            object at trial. If a defendant perceives a constitutional claim and
              believes it may find favor in the federal courts, he may not
25            bypass the state courts simply because he thinks they will be
              unsympathetic to the claim. Even a state court that has
26            previously rejected a constitutional argument may decide, upon

27  _____

28       [14]CV 01-2178-PHX-EHC and CV 01-2179-PHX-EHC.

reflection, that the contention is valid.

*Engle,* 456 U.S. at 130 (footnote omitted).  *See also Bousley v. United States,* 523 U.S. 614, 623 (1998) ("As we clearly stated in *Engle v. Isaac,....* 'futility cannot constitute cause if it means simply that a claim was 'unacceptable to that particular court at that particular time...' Therefore, petitioner is unable to establish cause for his default.") (internal citations omitted). "Following *Engle,* the Ninth Circuit rejected the futility doctrine and held that apparent futility of presenting habeas claims to state courts does not constitute cause to overcome a procedural default." *Lee,* 2009 WL 32743 at *9 (*citing Roberts v. Arave,* 847 F.2d 528, 530 (9th Cir. 1988).  Consequently, Petitioner's futility argument does not constitute cause to excuse the default of his third ground for relief.  *Id.  See also Gonzales v. McKune,* 279 F.3d 922, 924-925 (10th Cir. 2002).

A habeas petitioner "may also qualify for relief from his procedural default if he can show that the procedural default would result in a 'fundamental miscarriage of justice.'" *Cook,* 538 F.3d at 1028 (*citing Schlup v. Delo,* 513 U.S. 298, 321 (1995)).  *See also Majoy v. Roe,* 296 F.3d 770, 776-777 (9th Cir. 2002)(analyzing this exception in a non-capital case). This exception to the procedural default rule is limited to habeas petitioners who can establish that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup,* 513 U.S. at 327 (citation omitted).  *See also Murray,* 477 U.S. at 496; *Cook,* 538 F.3d at 1028.   "The miscarriage of justice exception is limited to those *extraordinary* cases where the petitioner asserts his innocence and establishes that the court cannot have confidence in the contrary finding of guilt." *Johnson v. Knowles,* 541 F.3d 933, 937 (9th Cir. 2008).   "'To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eye-witness accounts, or critical physical evidence–that was not presented at trial.'" *Cook,* 538 F.3d at 1028 (*quoting Schlup,* 513 U.S. at 324).  On the instant record, Petitioner has not argued that the failure to consider Ground Three "on the merits may result in a fundamental miscarriage of justice." *Lee,* 2009 WL 32743 at *9 (finding claim procedurally barred).  Nor has Petitioner  presented any evidence that would

1  support a finding that, in light of such alleged errors, the Court cannot have confidence in

2  the finding of guilt or that the alleged errors occurring during his trial have probably resulted

3  in the conviction of someone who was actually innocent of the offense.

4  **III.    CONCLUSION**

5       Petitioner's Grounds One and Two raised in his Amended Petition are without merit.

6  Additionally, Ground Three is procedurally defaulted and barred from federal habeas review

7  because Petitioner cannot excuse his procedural default.

8  **IV.    RECOMMENDATION**

9       For the foregoing reasons, the Magistrate Judge recommends that the District Court

10  deny and dismiss Petitioner's Amended Petition for Writ of Habeas Corpus (Doc. No. 18).

11       Pursuant to 28 U.S.C. §636(b), any party may serve and file written objections within

12  ten days after being served with a copy of this Report and Recommendation.  A party may

13  respond to another party's objections within ten days after being served with a copy thereof.

14  Fed.R.Civ.P. 72(b).  If objections are filed, the parties should use the following case number:

15  **CV 06-2724-PHX-EHC.**

16       Failure to file timely objections to any factual or legal determination of the Magistrate

17  Judge may be deemed a waiver of the party's right to *de novo* review of the issues.  *See*

18  *United States v. Reyna-Tapia,* 328 F.3d 1114, 1121 (9th Cir.) (*en banc*), *cert. denied,* 540 U.S.

19  900 (2003).

20       DATED this 31st day of March, 2009.

21

22  _____

    Héctor C. Estrada

23  United States Magistrate Judge

24

25

26

27

28